# 25-1773-cr

United States Court of Appeals
For the Second Circuit

Docket No. 25-1773-cr

UNITED STATES OF AMERICA,
*Appellee,*

-against-

SVETLANA DALI,
*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT SVETLANA DALI

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8793

*Attorney for Defendant-Appellant*
**SVETLANA DALI**

**Siobhan C. Atkins**
*Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 3

QUESTION PRESENTED ........ 3

STATEMENT OF THE CASE ........ 4

A. Svetlana Dali is arrested for stowing away aboard a transatlantic flight, and reveals that she believes she has been poisoned by the United States government ........ 4

B. Before trial, the district court precludes evidence of Ms. Dali's delusional beliefs. ........ 7

C. The trial ........ 11

1. Surveillance footage shows Ms. Dali walking through a security checkpoint, and onto a plane, without being asked for a boarding pass ........ 11

2. A flight attendant discovers Ms. Dali en route; the jury does not hear that Ms. Dali told the flight attendant that she believed she was being poisoned ........ 12

3. Ms. Dali is interviewed by law enforcement; defense counsel is precluded from showing excerpts of the interview that reveal Ms. Dali believed she was being poisoned. ........ 14

4. Other airport incidents ........ 16

5. Ms. Dali's testimony ........ 17

6. The parties' arguments on motive and mens rea, and the verdict ........ 19

D. The sentence ........ 22

ARGUMENT ........................................................................................ 26

THE DISTRICT COURT WRONGFULLY EXCLUDED PROBATIVE EVIDENCE THAT MS. DALI BELIEVED SHE WAS BEING POISONED. ........................................................................................ 26

A. Standard of review ........................................................................................ 26

B. Legal background ........................................................................................ 26

1. Even after the IDRA, mental health evidence is admissible to rebut the prosecution's proof of mens rea. .............................. 26

2. This Court has repeatedly vacated district court orders that incorrectly balanced evidence under Rule 403. .................... 31

C. The district court erred in excluding evidence of Ms. Dali's delusional beliefs. ........................................................................................ 34

1. The evidence was highly relevant—it spoke to Ms. Dali's mens rea, explained Ms. Dali's actions, and rebutted the government's arguments on motive ............................................ 34

2. The probative value was not substantially outweighed by danger of unfair prejudice. .......................................................... 40

D. The error was not harmless. ................................................................ 44

CONCLUSION ........................................................................................ 49

CERTIFICATE OF SERVICE ........................................................................ 50

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .................................. 51

## TABLE OF AUTHORITIES

### Cases

*Chambers v. Mississippi*,
410 U.S. 284 (1973) .......... 29
*Chapman v. California*,
386 U.S. 18 (1967) .......... 44
*George v. Celotex Corp.*,
914 F.2d 26 (2d Cir. 1990) .......... 32, 43
*Holmes v. South Carolina*,
547 U.S. 319 (2006) .......... 26
*In re Winship*,
397 U.S. 358 (1970) .......... 29
*Justice v. Hoke*,
90 F.3d 43 (2d Cir. 1996) .......... 26
*Mott v. Stewart*,
No. 98-CV-239, 2002 WL 31017646 (D. Ariz. Aug. 30, 2002) .......... 30, 38
*Palin v. New York Times Co.*,
113 F.4th 245 (2d Cir. 2024) .......... 32, 34
*Staples v. United States*,
511 U.S. 600 (1994) .......... 7
*United States v. Daly*,
842 F.2d 1380 (2d Cir. 1988) .......... 8
*United States v. Detrich*,
865 F.2d 17 (2d Cir. 1988) .......... 3, 45, 47
*United States v. Dupre*,
339 F. Supp. 2d 534 (S.D.N.Y. 2004) .......... 28
*United States v. Dupre*,
462 F.3d 131 (2d Cir. 2006) .......... 28
*United States v. Dupree*,
706 F.3d 131 (2d Cir. 2013) .......... 31, 32, 33
*United States v. Dwyer*,
539 F.2d 924 (2d Cir. 1976) .......... 32, 33

*United States v. Erskine*,
588 F.2d 721 (9th Cir. 1978) ....................26
*United States v. Figueroa*,
618 F.2d 934 (2d Cir. 1980) ....................26
*United States v. Garnes*,
102 F.4th 628 (2d Cir. 2024) .................... 33, 40, 41, 42
*United States v. Harris*,
733 F.2d 994 (2d Cir. 1984) ....................45
*United States v. Jones*,
No. 16 Cr. 553, 2018 WL 1115778 (S.D.N.Y. Feb. 27, 2018)....................29
*United States v. Levin*,
No. 15 CR. 101 (KBF), 2016 WL 299031 (S.D.N.Y. Jan. 25, 2016)....................37
*United States v. Monsalvatge*,
850 F.3d 483 (2d Cir. 2017) ....................31
*United States v. Morgan*,
786 F.3d 227 (2d Cir. 2015) .................... 25, 26, 39
*United States v. Odeh*,
815 F.3d 968 (6th Cir. 2016) .................... 28, 34
*United States v. Pohlot*,
827 F.2d 889 (3d Cir. 1987) .................... 28, 29, 30
*United States v. Schulte*,
No. 17-CR-548 (JMF), 2022 WL 1639282 (S.D.N.Y. May 24, 2022) ....................31
*United States v. Whitman*,
771 F.2d 1348 (9th Cir. 1985) .................... 30, 44
*United States v. Worrell*,
313 F.3d 867 (4th Cir. 2002) ....................29

**Statutes**

18 U.S.C. § 17 .................... 27, 28
18 U.S.C. § 17(a) ....................7, 28
18 U.S.C. § 2199 .................... 4, 6, 7
18 U.S.C. § 3231 ....................3
28 U.S.C. § 1291 ....................3

**Rules**

Fed. R. Evid. 403 ........................................................................................31

## INTRODUCTION

Shortly before Thanksgiving in 2024, Svetlana Dali walked through security at JFK Airport and onto a Delta flight to Paris, even though she had no boarding pass or passport. At trial on a stowaway charge, the government insisted that Ms. Dali "carefully executed her plan step-by-step"; "knew exactly what she was doing"; and was motivated by a simple desire to "get a free flight to Europe." 1A.268.[1] But the district court prohibited defense counsel from introducing crucial evidence that would establish that Ms. Dali was not simply trying to go on a free European vacation; rather, she suffered from delusions that she was being poisoned in the United States. Ms. Dali's delusional and paranoid belief system motivated her to board the flight; bore on whether she knew she lacked

[1] Citations to the first volume of the appendix (pp. 1–295) are preceded by "1A." Citations to the second volume of the appendix (pp. 296–547) are preceded by "2A." Citations to the third volume of the appendix (pp. 548–638) are preceded by "3A." Citations to the presentence report are preceded by "PSR." Copies of the presentence report have been provided to the Court under separate cover.

consent to do so; and helped explain conduct that the government argued evinced a guilty state of mind.

The district court's error in excluding all evidence of Ms. Dali's delusions violated her due-process rights and her right to present a complete defense. Thanks to the district court's ruling, the government was able to present a one-sided account of Ms. Dali's knowledge and actions—actions (like "watching" and "waiting") that would have taken on an entirely different meaning had the jury known about Ms. Dali's delusional beliefs. And in excluding the evidence under Rule 403, the court refused to acknowledge the probative value of the evidence—declaring it, in less than a sentence, as "limited"—and did not even consider whether a limiting instruction could cure any risk of undue prejudice.

This error was not harmless. Ms. Dali's entire defense at trial was that—where Ms. Dali was never asked for a boarding pass or passport as she boarded the plane—the government had not proven beyond a reasonable doubt that she knew she lacked consent to board. Defense counsel reminded the jury that knowledge was not to be assessed from a

"common person's point of view"—instead, the jury must consider "what [Ms. Dali] knew" and "what she understands." But defense counsel was precluded from pointing to the most central piece of evidence that Ms. Dali didn't see things the way others did. And this Court "cannot find it harmless" to exclude evidence "that 'would have supported the main theory of the defense.'" *United States v. Detrich,* 865 F.2d 17, 21 (2d Cir. 1988). This Court should therefore vacate Ms. Dali's conviction and remand for further proceedings.

## STATEMENT OF JURISDICTION

Svetlana Dali appeals from a judgment of conviction entered on July 11, 2025 in the Eastern District of New York (Donnelly, J.,). Ms. Dali timely filed a notice of appeal on July 16, 2025. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291.

## QUESTION PRESENTED

> In Ms. Dali's prosecution for stowing away aboard a transatlantic flight, the district court excluded evidence that Ms. Dali believed she was being poisoned in the United States. The district court excluded the evidence even though it was highly relevant to her state of mind (namely, whether she knew she lacked consent to board the flight); helped explain behaviors that, per the government, bespoke consciousness of guilt; and rebutted the government's arguments that

Ms. Dali was simply motivated to get a "free flight." The district court also failed to even consider whether a limiting instruction would have alleviated the risk of jury confusion.

The question presented is: Did the district court err in excluding evidence of the defendant's delusions under Rule 403?

## STATEMENT OF THE CASE

Svetlana Dali was convicted, following a jury trial, of stowing away on an aircraft in violation of 18 U.S.C. § 2199. She was sentenced to time served plus one year of supervised release. Judge Donnelly (E.D.N.Y.) presided over the trial and sentencing. Prior to trial, Judge Donnelly granted the government's motion to preclude evidence that Ms. Dali suffered from delusions during the time period of the charged conduct; the decision is unreported.

## STATEMENT OF FACTS

### A. Svetlana Dali is arrested for stowing away aboard a transatlantic flight, and reveals that she believes she has been poisoned by the United States government.

On November 26, 2024, a flight attendant on Delta Air Lines flight 264—en route from John F. Kennedy Airport in New York City to Charles de Gaulle Airport in Paris, France—discovered that 57-year-old Svetlana Dali was on board without a ticket. *See* PSR ¶¶ 6, 11. It soon became clear

that Ms. Dali believed she needed to leave the country because the United States government was poisoning her. 1A.61.

[redacted]

[redacted]

Ms. Dali referenced her delusional beliefs repeatedly when explaining why she had boarded the Delta flight. While still on the plane,

Ms. Dali told a flight attendant about her belief that she was being poisoned in the United States, and said that she was trying to seek asylum in another country. 1A.61. Then, upon her arrest by French authorities in Paris, she did in fact claim asylum in France—a request that was denied. PSR ¶ 12. Ms. Dali similarly told U.S. Customs officials who interviewed her in Paris that she was suffering from polonium poisoning at the hands of Russian and American actors, and that she was unable to get proper treatment in the United States. 1A.61. And finally, after she was transported back to the United States and was interviewed by law enforcement, Ms. Dali explained that she "had to leave this country (the United States)" because police refused to protect her from people who were poisoning her. 1A.61. She also said that she once hoped that police could protect her in this country, but they just laughed in her face as she vomited blood. 1A.61.

Ms. Dali was charged with one count of stowing away aboard an aircraft, in violation of 18 U.S.C. § 2199. 1A.15. The statute requires that a defendant board an aircraft, with the intent to obtain transportation, and

without the consent of the aircraft's "owner, charterer, master, or person in command." 18 U.S.C. § 2199. To be liable under this statute, a defendant must know that she lacks consent to board the aircraft. *See, e.g.*, 2A.527–31 (district court's instructions regarding the elements of this offense); *Staples v. United States*, 511 U.S. 600, 605 (1994) (holding that statutes must be read to require that defendants know the facts that make their conduct illegal).

### B. Before trial, the district court precludes evidence of Ms. Dali's delusional beliefs.

Shortly before trial, the government moved, among other things, to preclude all evidence of Ms. Dali's delusion that she was being poisoned. In its submission, the government argued that Ms. Dali's "scheme" to "evade" airport security measures was "carefully calculated" and "deliberate." 1A.27–28. Yet it moved to preclude key evidence that tended to undercut that assertion—that at the time, Ms. Dali suffered from delusions that led her to believe she was being poisoned by various governmental actors. The government argued that such evidence was prohibited by the Insanity Defense Reform Act (IDRA), 18 U.S.C. § 17(a).

The government conceded that the IDRA does not preclude a defendant from using mental health evidence to rebut the prosecution's proof of mens rea, but it argued that [redacted]

Defense counsel opposed the motion. 1A.60–65. Counsel argued that Ms. Dali's delusional beliefs were "relevant to show 'the circumstances surrounding the events'" and "'to furnish an explanation of the understanding or intent with which certain acts were performed.'" 1A.61 (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)). After all, Ms. Dali's knowledge, understanding, and intent would all be at issue at trial, and her delusional beliefs spoke directly to these topics. Ms. Dali's persecutory beliefs and delusions were relevant to the way she acted while in the airport and on the flight—and to whether those actions bespoke guilt, as the government argued, or simply reflected Ms. Dali's delusions. They were also relevant to whether she knew she did not have permission

to board the flight. Someone who misinterprets the actions or intentions of others to such a degree that they believe they're being followed and poisoned could similarly misinterpret whether gate agents—who failed to ask for a boarding pass—had given her "consent" to fly on behalf of Delta. Alternatively, someone who believes she is being poisoned may be so distracted by her persecutory delusions that she does not know what she's been permitted (or not permitted) to do.

Counsel also argued that "[g]ranting the government's request to conceal clearly relevant evidence from the jury would frustrate th[e] 'fundamental goal'" of "arriving at the truth" in the trial, and would "likely result in a strong urge by jurors to engage in speculation as to the reasons for Ms. Dali's conduct." 1A.62. As for the claim that this probative mental health evidence would confuse the jury and invite it to nullify, defense counsel noted that "courts have long relied on the strong presumption that juries follow limiting instructions." 1A.61–62.

In reply, the government maintained its arguments that the evidence should be excluded. It additionally complained that admitting the evidence

would invite a "mini-trial" into whether the defendant "was in fact poisoned" and whether she "genuinely believed" she was—and argued that that proved that this evidence as to Ms. Dali's state of mind "clearly should not be the focus of this trial." 1A.68.

The district court granted the government's motion to exclude the evidence. It found that the evidence was of "limited probative value" but posed a "significant" "risk of confusion to the jury," because "it could create concerns about whether or not [Ms. Dali] has some kind of a mental illness, and that's not the defense here." 1A.73–74. The court further found that "to the extent the Government contests" Ms. Dali's "actual belief" that she was poisoned, "it could take us off on a side road that would amount to a trial within a trial." 1A.74. The court did not address defense counsel's argument that a limiting instruction would be sufficient to alleviate any risk of confusion or improper use of the evidence by the jury.

## C. The trial

### 1. Surveillance footage shows Ms. Dali walking through a security checkpoint, and onto a plane, without being asked for a boarding pass.

At trial, the government introduced testimony from a manager at JFK Airport's Terminal 4 who reviewed airport security footage after Ms. Dali was found aboard Flight 264. That footage showed Ms. Dali first lining up in the economy line to go through a TSA security screening checkpoint and encountering a queuing agent—an employee hired by an independent contracting company who helps steer passengers in the right direction as they prepare to walk through security. 2A.327; 2A346–48; 3A.637 (GX 100). The video shows Ms. Dali interacting briefly with the queueing agent and then appearing to head toward a different line. 3A.637 (GX 100). The security footage lacks audio, so the security manager could not say what the queueing agent said to Ms. Dali. 2A.347–48.

Ms. Dali then walked to another line—a line intended for airport employees, crew members, and anyone who needs "special assistance." 2A.349–50; 3A.637 (GX 101). No queueing agent spoke to Ms. Dali as she walked down this line. 2A.351–52; 3A.637 (GX 101–02). She then rejoined a

passenger line and walked past the TSA checkpoint, and through the security screening, without anyone asking for her boarding pass or identification. 3A.637 (GX 103; GX 104 at 00:18–2:08; GX 105 at 00:20–04:16). And security footage showed that when Ms. Dali arrived at the gate, she walked at a normal pace through two gate agents checking boarding passes and passports, without either one of them asking her for documents. 3A.637 (GX 106 at 00:03–00:20). As the manager who reviewed the security footage testified, from the moment Ms. Dali got in the special assistance line to the moment she boarded the plane, no one asked her for a boarding pass. 2A.355.

**2. A flight attendant discovers Ms. Dali en route; the jury does not hear that Ms. Dali told the flight attendant that she believed she was being poisoned.**

The government also called Cleomie Meme, the flight attendant who discovered that Ms. Dali did not have a ticket. Ms. Meme explained that she did not check all passengers' boarding passes during boarding, as the gate agents are "supposed to" check them before passengers step onto the jet bridge. 1A.282.

Ms. Meme first spoke to Ms. Dali about an hour into the flight. 1A.283–84. After realizing that one of the bathrooms had been occupied for a while, Ms. Meme and her coworker knocked on the bathroom door. 1A.283. Ms. Dali, who was inside the bathroom, opened the door and indicated that she was feeling sick; she declined medical assistance but asked for water. 1A.283–85. Ms. Meme noted that Ms. Dali "looked like she ... didn't feel well," 1A.284, and that she looked "pale," 1A.290.

It was not until the plane was close to landing that Ms. Meme asked Ms. Dali to take her seat, and it became clear that Ms. Dali did not have one. 1A.288–89. When asked for her name, Ms. Dali first gave the name Amy Hudson, or Emily Hudson; she also attempted to show Ms. Meme her "identification," which was actually an Amtrak train ticket with a man's name on it. 1A.289–92.

Given the district court's ruling, defense counsel was prohibited from asking Ms. Meme about other statements made by Ms. Dali: that she believed she was being poisoned and was seeking asylum. 1A.61; 2A.358 (defense counsel noting that "reports I read indicate that Ms. Meme

understood Ms. Dali to say that she got on the flight because she was seeking asylum and that the U.S. government was poisoning her ... I understood that your ruling on the motion in limine precluded me from asking [about] that; otherwise, I would have asked it.").

### 3. Ms. Dali is interviewed by law enforcement; defense counsel is precluded from showing excerpts of the interview that reveal Ms. Dali believed she was being poisoned.

The government also introduced testimony from a Port Authority detective who participated in an interview of Ms. Dali after she returned to the United States. 2A.404–433. Excerpts of the interview, introduced by video and by transcript, indicated that Ms. Dali didn't even know where she was going: she explained, "I couldn't tell which planes I was trying to get in ... I know there were planes in European countries and that's it." 3A.612–13. She explained that, as she was navigating the TSA checkpoint, she joined the line with airline employees simply because it was "moving." 3A.622; *see* 3A.637 (GX 100, 101). The FBI agent conducting the interview asked specifically whether she joined the line for "any other reason"; Ms. Dali responded, "No, it was moving fast." 3A.622.

Ms. Dali conceded that she had been asked for a boarding pass previously, before she joined the line with the airline employees. 3A.624. But then she explained, "When you knock, a door will—a door will open." 3A.624. When the FBI agent asked what she meant, she explained, "It's from the—it's a line from the Bible." 3A.624.

And from Ms. Dali's viewpoint, she knocked and a door opened—she was permitted to get into the secure section of the airport and onto the plane. She said that at the TSA checkpoint, she "passed the check" and then had her belongings scanned. 3A.629. And she explained—as the surveillance video itself shows—that she was never asked for a ticket when she boarded the plane: "[T]hey didn't ask me for a ticket … I just like went by—went through and that's it." 3A.615–16.

After law enforcement asked her repeatedly about boarding passes, Ms. Dali said that she was "afraid" that someone would ask her for a boarding pass, and said that she was "scared" because I "believe, I believe [inaudible] administrative [inaudible] I … I'm breaking the administrative law because I was studying law." 3A.626. But Ms. Dali was never clear on

which law she believed she was breaking, or what she even understood an "administrative law" to be. 3A.626–27. And the detective admitted that those comments came toward the end of a two-hour interview, after Ms. Dali had been in the custody of the French authorities for approximately a week and had just been on a transatlantic flight back to the United States. 2A.422–24, 2A.430.

Defense counsel was precluded from introducing several other portions of this interview: the portions where Ms. Dali mentioned her beliefs that she had been poisoned. The jury never heard her statements that she "had to leave this country (the United States)" because, in her mind, police refused to protect her from people who were poisoning her. 1A.61 *see, e.g.*, 3A.638 at 56:18–57:52; 59:37–1:02:09.

**4. Other airport incidents**

The government also introduced evidence of two other airport incidents. A TSA official testified that, the same week Ms. Dali boarded the Delta flight, Ms. Dali also attempted to board a JetBlue flight at the Bradley International Airport in Connecticut without showing a boarding pass.

2A.370–72; 2A.378–79. During that incident, despite apparently lacking a boarding pass, Ms. Dali walked through TSA's security checkpoint; had her face scanned; and eventually was able to enter the secure area of the airport. 2A.376–77; 2A.382. She was denied entry only when she attempted to board the flight itself. 2A.376–79. The testifying official did not interact with Ms. Dali—he merely reviewed security footage that lacked audio—so he could not speak to Ms. Dali's demeanor or what gate agents told Ms. Dali when she was not permitted to board the plane. 2A.383–85.

A CBP official also testified that in February 2024, Ms. Dali was found without a boarding pass in a bathroom in the Miami International Airport, in an area designated for arriving international passengers. 2A.388–90.

**5. Ms. Dali's testimony**

Ms. Dali then testified. Before her testimony, the district court reiterated its ruling that Ms. Dali could not recount or reference any of her delusional beliefs, even though she was taking the stand in her own defense. The court stated that "prior to the trial, I had ruled that the defense could not introduce Ms. Dali's statements about believing she was

being poisoned," and explained that that "rule still applies because I found that the probative value was outweighed by the prejudice." 2A.442. The court told defense counsel to "make sure Ms. Dali understands that." 2A.442.

Given that ruling, Ms. Dali was not permitted to testify about her belief that she was being poisoned, even though it was her motivation for boarding the flight and explained some of her actions at the airport and on the plane that day. She also was not allowed to mention what she told the flight attendants and arresting agents about her beliefs. Ms. Dali attempted to explain that she "boarded the plane in order to fly where I wanted to," but with no further opportunity to explain her beliefs or her motivations, the district court directed, "Next question, please." 2A.463.

Ms. Dali testified that no one asked her for a ticket or a boarding pass as she boarded the plane. She added that she wasn't paying attention to the other travelers who were asked for passports and boarding passes, and that she might have believed she didn't need one; after all, staff never asked her for one. 2A.459–61. She told the jury that she went to the plane's bathroom

because she was feeling sick (but, of course, she was not allowed to reference her persistent belief that she was sick because she had been poisoned). 2A447–48. She also explained that she agreed to answer law enforcement's questions, but as she was being interviewed, she "didn't feel well" and was "very uncomfortable" and "tired." 2A.466–67.

**6. The parties' arguments on motive and mens rea, and the verdict**

In arguing its case to the jury, the government repeatedly inserted the question of Ms. Dali's motive into the case—and insisted that Ms. Dali committed the crime because she wanted to avoid paying for a plane ticket. In opening, for example, the government argued that "[t]he defendant's plan to get a free flight to Europe almost worked." 1A.268. And in closing, the government insisted that Ms. Dali was motivated to "fly where she wanted to go for free." 2A.479–80. Defense counsel was prohibited from rebutting this motive argument by explaining the true motive for Ms. Dali's actions: far from simply wanting a free ride for a vacation to Europe, Ms. Dali believed she was being poisoned and had to get away from the United States. *See* 1A.73–74.

The government also argued that Ms. Dali was acting knowingly and intentionally in getting on the plane—and that she knew she did not have consent to board the plane. It argued in opening that "she carefully executed her plan step-by-step to sneak through airport security checkpoints and onto an international flight." 1A.267. And it argued in closing that Ms. Dali "knew exactly what she was doing," and "made conscious choices to avoid detection to hide what she was doing to manipulate the people around her and to slip through the cracks in the system so she could get on that plane." 2A.479–80. The government repeatedly pointed to Ms. Dali's watchful demeanor in the airport as evidence that she was acting knowingly and with criminal intent: "She waits, she watches, she canvasses the area for her opportunity." 2A.484; *see also* 2A.485 ("She waits, she watches. She follows somebody else in when she sees her moment to go in.").

Ms. Dali's defense, in turn, was that the government had not proven beyond a reasonable doubt that she knew she lacked consent to board the plane. Defense counsel noted that she was never asked for a boarding pass

or a ticket as she boarded the plane itself. 2A.495–96. And defense counsel further reminded the jury that knowledge was not to be assessed from a "common person's point of view"—instead, the jury must consider "what *she* knew" and "what *she* understands." 2A.499 (emphasis added).

But defense counsel was precluded from pointing to the most central piece of evidence that Ms. Dali didn't see things like a "common person" would—that she suffered from paranoid delusions that she was being poisoned. Defense counsel also could not rebut the government's arguments that, far from being a sign that she was a calculating criminal, Ms. Dali's watchfulness was in fact a product of her paranoia. The district court went so far as to convene a sidebar after defense counsel suggested in summation that Ms. Dali "wasn't thinking straight," as the court insisted that that "sounds like you're mak[ing] a mental disease argument." 2A.497–98. It also precluded defense counsel from rebutting the government's argument that Ms. Dali was a calculating criminal by arguing that Ms. Dali was in fact "desperate" and that it was "obvious" that "she felt she needed to leave the country." 2A.503.

In addition to precluding defense counsel's comments, the district court instructed the jury—immediately following the defense summation—that there "is no evidence before you that [Ms. Dali] suffered from any medical or mental condition and you're not to misstate [sic] about that." 2A.508. In its final instructions to the jury, the district court again emphasized that "there is no evidence before you that the defendant has a particular mental or medical condition, nor should you speculate whether she has any such condition." 2A.530.

The jury convicted Ms. Dali of the sole count.

### D. The sentence

On July 10, 2025, the parties appeared for sentencing. The Probation Department calculated Ms. Dali's Guidelines range as 0 to 6 months in prison, as she had no criminal history. PSR ¶¶ 77–78. The PSR noted that while on pretrial supervision, Ms. Dali had fled to the Canadian border and attempted to claim refugee status, arguing that she faced human trafficking in the United States and had been poisoned, PSR ¶ 4; after that incident,

Ms. Dali was remanded and had already served over 6 months in prison by the time of sentencing. PSR ¶ 5.

[redacted]

Ms. Dali addressed the Court and explained that she believed she had been poisoned by "some unknown criminal group" starting in 2019. 3A.584. She told the Court that she had been driving to the airport one day that year when she passed a "military vehicle" that was producing a "very nasty chemical smell." 3A.584. She seemed to believe that that vehicle was

poisoning her, and after she arrived at the airport and traveled to Dublin and then to Russia, she said she discovered that she had "military poisons" in her bloodstream. 3A.585.

She said that when she went to the hospital to have her blood tested on other occasions in the United States, her blood was taken by "military men," seeming to suggest that the results were tampered with. 3A.586–88. Ultimately, she alleged, the poisoning caused her severe symptoms that she continued to experience on the Delta flight, like vomiting up blood. She insisted, "[M]y actions were directed only towards only one purpose, to save my life." 3A.594.

The district court sentenced Ms. Dali to time served and one year of supervised release. 3A.602–03. This appeal followed.

## SUMMARY OF ARGUMENT

The district court abused its discretion in excluding evidence of Ms. Dali's delusions under Rule 403. Evidence that Ms. Dali believed she was being poisoned was tremendously probative. It rebutted the government's arguments that Ms. Dali was a fraudster; bore on whether she knew she

lacked consent to board the flight; and helped explain conduct that the government argued evinced a guilty state of mind. And this probative value was not substantially outweighed by any danger of unfair prejudice. Any risk of jury confusion could be addressed via a limiting instruction, and the government could hardly complain of unfair prejudice when it chose to place Ms. Dali's motives and conduct at issue.

Nor was the error harmless. Virtually all the evidence the jury saw and heard—including Ms. Dali's testimony and video footage of her actions (like "watching" and "waiting")—would have taken on a different meaning had the jury known about Ms. Dali's delusional beliefs. What is more, the evidence went to Ms. Dali's central defense at trial—that the government had not proven that she knew she lacked consent to board the plane. This Court should vacate and remand.

# ARGUMENT

## THE DISTRICT COURT WRONGFULLY EXCLUDED PROBATIVE EVIDENCE THAT MS. DALI BELIEVED SHE WAS BEING POISONED.

### A. Standard of review

This Court reviews a decision to exclude evidence under Rule 403 for abuse of discretion. *United States v. Morgan*, 786 F.3d 227, 232 (2d Cir. 2015). Where 'there was inadequate consideration of the probative value of the evidence,' or a failure to adequately 'consider the risk of unfair prejudice and to balance this risk against probative value,' we will reverse an evidentiary determination as an abuse of discretion." *Id.* (quoting *United States v. Figueroa*, 618 F.2d 934, 942 (2d Cir. 1980)).

### B. Legal background

#### 1. Even after the IDRA, mental health evidence is admissible to rebut the prosecution's proof of mens rea.

Criminal defendants have the constitutional right to present a complete defense. *See, e.g.*, *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). This right is enshrined in the Fifth Amendment's Due Process Clause, as well as the Confrontation and Compulsory Process Clauses of the Sixth

Amendment. *See id.* This guaranty includes the defendant's right to offer evidence on his own behalf, *see, e.g.*, *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996), including evidence tending to show, either circumstantially or directly, that he lacked the requisite intent or knowledge, or to otherwise rebut the government's evidence with respect to mens rea, *see, e.g.*, *United States v. Erskine*, 588 F.2d 721, 722 (9th Cir. 1978) (Kennedy, J.) ("The rule that a defendant may rebut or seek to disprove the Government's case by showing that one or more elements of a criminal offense did not occur extends to any of the mental components necessary to establish guilt of the crime in question.").

In 1984, Congress passed the Insanity Defense Reform Act (IDRA), which limits the circumstances under which a defendant may ask a jury to excuse his conduct via mental-health evidence. The relevant statute, 18 U.S.C. § 17, states:

(a) **Affirmative Defense**.—

> It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature

> and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
>
> (b) **Burden of Proof**.—
>
> The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

By requiring a defendant to prove insanity by clear and convincing evidence, and by eliminating a prong that "had permitted acquittal if the defendant 'as a result of mental disease or defect ... lacks substantial capacity ... to conform his conduct to the requirements of law,'" *United States v. Pohlot*, 827 F.2d 889, 896 (3d Cir. 1987), Congress limited the circumstances under which a defendant could claim the insanity defense. And by specifying that "[m]ental disease or defect does not otherwise constitute a defense," 18 U.S.C. § 17(a), Congress similarly barred other "alternative 'affirmative defenses' that 'excuse' misconduct." *Pohlot*, 827 F.2d at 897.

But even after the IDRA, "evidence of a defendant's diminished mental capacity remains admissible to prove that the defendant could not form the required *mens rea*." *United States v. Odeh*, 815 F.3d 968, 980 (6th

Cir. 2016); *see also United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006). After all, "on its face, the text of 18 U.S.C. § 17" simply heightens the burden of proving insanity and prevents defendants from excusing their conduct via any similar affirmative defense; the text "does not foreclose the use of mental disease evidence to negate" an element of the offense in the first instance. *United States v. Dupre*, 339 F. Supp. 2d 534, 537 (S.D.N.Y. 2004), *aff'd*, 462 F.3d 131 (2d Cir. 2006); *see also United States v. Jones*, No. 16 Cr. 553, 2018 WL 1115778, at *4–5 (S.D.N.Y. Feb. 27, 2018) (Nathan, J.) (permitting defendant to introduce evidence of his delusional belief that he was a United Nations official, since this tended to disprove the mens rea element of unlawfully impersonating an officer). Ultimately, then, a defendant is still free to introduce "psychiatric evidence or testimony to show he did not do it," even though he is barred from introducing evidence short of an insanity defense that "he could not help it." *United States v. Worrell*, 313 F.3d 867, 874 (4th Cir. 2002).

Precluding defendants from challenging mens rea via mental health evidence would raise a "serious constitutional question." *Pohlot,* 827 F.2d at

900–01. After all, "due process requires that the government prove every element of a criminal offense beyond a reasonable doubt." *Id.; see In re Winship*, 397 U.S. 358, 363–64 (1970). Because a defendant's right to present a defense generally includes the right to the admission of evidence to rebut those elements, *see, e.g., Chambers v. Mississippi*, 410 U.S. 284, 299–302 (1973), "a rule barring evidence on the issue of mens rea may be unconstitutional so long as we determine criminal liability in part through subjective states of mind." *Pohlot*, 827 F.2d at 901; *see also Mott v. Stewart*, No. 98-CV-239, 2002 WL 31017646, at *6 (D. Ariz. Aug. 30, 2002) (holding that the trial court violated the defendant's right to present a complete defense when it precluded mental health evidence "offered to negate the specific intent element of an offense [and] to establish an alternative explanation for a defendant's conduct").

Further, because the IDRA speaks only of mental health evidence used to further an affirmative "defense," nothing about the Act precludes a defendant from *rebutting* evidence—even evidence that does not go to an element of the crime, such as evidence of motive—where the government

opens the door. Thus, even if a court could otherwise preclude psychiatric evidence of a defendant's motive or lack thereof, due process—and basic fairness—requires that a defendant be able to offer this evidence to rebut a government's alternative explanation as to motive, if the government elects to put one in. *See, e.g.*, *United States v. Whitman*, 771 F.2d 1348, 1351 (9th Cir. 1985) (holding that while "[t]he district court was free to exclude evidence of [the defendant's] motive," "once the government produced evidence from which the jury could reasonably infer the ... motive, appellant had the right to rebut this evidence" as a matter of due process); *see also United States v. Schulte*, No. 17-CR-548 (JMF), 2022 WL 1639282, at *9 (S.D.N.Y. May 24, 2022).

**2. This Court has repeatedly vacated district court orders that incorrectly balanced evidence under Rule 403.**

A district court may exclude relevant evidence pursuant to Rule 403 only "if its probative value is *substantially* outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). "A court should consider

the possible effectiveness of a jury instruction and the availability of other means of proof in making a Rule 403 determination." *United States v. Dupree*, 706 F.3d 131, 138 (2d Cir. 2013). And "in reviewing a district court's Rule 403 ruling," this Court "generally maximize[s] the evidence's probative value and minimize[s] its prejudicial value." *United States v. Monsalvatge*, 850 F.3d 483, 494 (2d Cir. 2017) (internal quotation marks and alterations omitted). Ultimately, "[b]ecause Rule 403 permits the exclusion of probative evidence, it is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990).

This Court has repeatedly vacated judgments where a district court improperly balanced evidence under Rule 403. Indeed, this Court has noted that where "the probative value of the evidence proffered" is "great," the evidence cannot be excluded "in the absence of a significant showing of unfair prejudice." *United States v. Dwyer*, 539 F.2d 924, 928 (2d Cir. 1976). Thus, where a judge declined to admit evidence of a party's knowledge and bias by "improperly discount[ing] the evidence's probative value" and "articulat[ing] no countervailing prejudice," this Court found

an abuse of discretion warranting a new trial, even where the error was subject to plain-error review. *Palin v. New York Times Co.*, 113 F.4th 245, 275 (2d Cir. 2024).

This Court reached a similar conclusion in *United States v. Dupree*, 706 F.3d 131. There, this Court vacated a district court's order excluding evidence under Rule 403 where the evidence was offered to show the defendant's "knowledge and intent at the time he obtained the relevant funds," an issue that would likely "play a central role in the trial." *Id.* at 138. Simply put, "[t]he district court committed legal error in not considering the" evidence's "probative value on [the defendant's] state of mind." *Id.*; *see also United States v. Garnes*, 102 F.4th 628, 642 (2d Cir. 2024) (district court "exceeded its discretion" by excluding portions of a defendant's threats in a true threats case, finding that the court "incorrectly balanced the probative value and danger of unfair prejudice" and erred in concluding "that a limiting instruction could not cure any prejudice"); *Dwyer*, 539 F.2d at 928–29 (vacating and remanding for a new trial where

the district court excluded "critical" psychiatric testimony and failed to balance the probative value against any unfair prejudice).

### C. The district court erred in excluding evidence of Ms. Dali's delusional beliefs.

#### 1. The evidence was highly relevant—it spoke to Ms. Dali's mens rea, explained Ms. Dali's actions, and rebutted the government's arguments on motive.

The district court implicitly rejected the government's argument that evidence of Ms. Dali's delusions could not be admitted under the IDRA. And no wonder: Defense counsel sought to admit the evidence not to affirmatively "excuse" Ms. Dali's conduct, but to shed light on her knowledge and intent, and to provide context for some of her actions during her alleged criminal act. 1A.61–62; *see, e.g.*, *Odeh*, 815 F.3d at 981 (psychiatric testimony admissible despite the IDRA where the defendant offered the testimony not as "an affirmative defense ... that might absolve her of criminal responsibility," but instead, "to prove that she did not possess the required mental state").

Nevertheless, the district court excluded this evidence under Rule 403, because it "improperly discounted the evidence's probative value."

*Palin*, 113 F.4th at 275. Indeed, the district court spent less than a sentence on the evidence's relevance, dismissing it as "of limited probative value." 1A.73. But the evidence of Ms. Dali's beliefs went to two critical issues. First, the evidence spoke to whether Ms. Dali possessed the mens rea for the offense—both in rebutting the government's arguments on mens rea and in supporting Ms. Dali's only real defense at trial. Second, the evidence rebutted the government's arguments about Ms. Dali's motive—that she simply wanted to obtain a free flight.

On mens rea, the evidence of Ms. Dali's chronic delusions and atypical belief system went to whether Ms. Dali acted with the requisite knowledge: whether she knew she lacked consent to board the flight. *See, e.g.*, 2A.530–31. Indeed, the evidence of Ms. Dali's delusions was essential to rebutting the government's arguments on Ms. Dali's state of mind and to mounting a defense. The government insisted that the jury should use its "common sense" about human behavior to conclude that Ms. Dali knew she lacked consent to board the flight. 2A.508. And it repeatedly argued that Ms. Dali "knew exactly what she was doing" based on her watchful

demeanor at the airport—"[S]he waits, she watches, she canvasses the area for her opportunity" 2A.484, 2A.479; *see also* 2A.485, 2A.511.

But Ms. Dali suffered from delusions that, if introduced, would have cast her behavior and knowledge in an entirely different light. The "watch[ing]" and "wait[ing]" that the government declared a sign of plotting? That is behavior characteristic of someone who believes they are being poisoned. And the "common sense" that, per the government, necessarily meant Ms. Dali knew what she was doing? Ms. Dali, suffering from these delusions, lacked common sense at the time of her crimes.

[redacted]

To put it differently, a reasonable person in Ms. Dali's position may see just negligence in a flight attendant failing to check a boarding pass or a

TSA agent failing to check a passport. But to someone like Ms. Dali—who sees hidden motives everywhere—this looks like consent: to her "knock[ing]" and a "door...open[ing]." 3A.624. Alternatively, Ms. Dali—convinced she is being poisoned and is vomiting up blood—was likely so distracted by her delusions that she may not have even acted knowingly and intentionally in boarding the plane. *See, e.g.*, *United States v. Levin*, No. 15 CR. 101 (KBF), 2016 WL 299031, at *8, *11 (S.D.N.Y. Jan. 25, 2016) (noting the distinction between "capacity" to form a required mens rea—governed by the IDRA—and whether the requisite mens rea has in fact been formed, and allowing the defendant to introduce evidence that his medical conditions "were sufficiently encompassing of his mind and attention that what was happening around him did not sink in to his consciousness" and he did not have the requisite intent and knowledge).

This evidence of Ms. Dali's delusions went to her central defense at trial. Defense counsel repeatedly argued that while one might think it's a matter of "common sense" that you don't have permission to fly even where you're not asked for a boarding pass, Ms. Dali was not acting with

common sense. *See* 2A.496–97. And defense counsel pointed out that the jury had to consider matters from Ms. Dali's perspective, not from an objective observer's perspective: Jurors, he said, must consider "[w]hat her knowledge was, right, from her point of view. Not a common person's point of view." 2A.499. But defense counsel was prevented from eliciting critical evidence that Ms. Dali doesn't see things the way others do: that she was suffering from delusions that made her misunderstand human behavior, to the point she believed she was poisoned. *See Mott*, 2002 WL 31017646, at *6 (finding violation of the right to present a complete defense where the trial court excluded mental health evidence offered to "provide an alternative explanation for [the defendant's] conduct" and "negate the state's evidence that she acted intentionally or knowingly").

The mental health evidence was probative for another reason: It rebutted the government's arguments as to Ms. Dali's motive for getting on the plane. The government repeatedly placed Ms. Dali's motive at issue—and insisted that Ms. Dali's motive was simply to avoid paying for a plane ticket. In opening, for example, the government argued that "[t]he

defendant's plan to get a free flight to Europe almost worked." 1A.268. And in closing, the government insisted that Ms. Dali was motivated to "fly where she wanted to go for free." 2A.480. In addition to portraying Ms. Dali as a fraudster, this false claim bolstered the government's arguments on mens rea, as it suggested that Ms. Dali must have knowingly evaded security requirements as part of this scheme. Defense counsel was prohibited from rebutting this motive claim and explaining the true reason Ms. Dali boarded the plane: far from simply wanting a free ride for a vacation to Europe, Ms. Dali believed she was being poisoned and had to leave the country. *See* 1A.73–74.

Against this backdrop, the district court failed to appreciate the probative value of the evidence. It failed to do so not only before trial—when it first excluded the evidence—but also during trial, when it had heard Ms. Dali's defense and the government's arguments on motive yet reiterated that its "rul[ing] still applies." 2A.442. It also did so at the end of trial, where it repeatedly precluded defense counsel from even arguing that

based on her actions, Ms. Dali wasn't "thinking straight" and was not "sneaky" but instead was "desperate." 2A.503.

Where, as here, "there was inadequate consideration of the probative value of the evidence," the district court has "abuse[d] [its] discretion." *Morgan*, 786 F.3d at 232 (internal quotation marks omitted).

**2. The probative value was not substantially outweighed by danger of unfair prejudice.**

The district court didn't just understate the evidence's probative value; it also overstated its potential for unfair prejudice.

As its primary reason for excluding the evidence, the district court cited the risk of juror confusion, finding the risk "significant" because "it could create concerns about whether or not she has some kind of a mental illness, and that's not the defense here." 1A.74. But the district court did not even address defense counsel's argument that any risk of juror confusion could easily be addressed via a limiting instruction. 1A.62. This error itself warrants vacatur: This Court has oft recognized that courts must "presume that juries follow limiting instructions," *Garnes*, 102 F.4th at 642 (internal quotation marks omitted), and that a court cannot "overweight[] the

prejudicial effect of the [evidence] by failing to recognize the likelihood that the danger of unfair prejudice could be mitigated by a limiting instruction," *id.* at 635.

On this point, *Garnes* is instructive. There, over the government's objection, a district court excluded evidence that the defendant referenced and exaggerated his criminal history in the course of making the alleged threats at the heart of the prosecution—evidence that was part of the "res gestae" surrounding the crimes and was relevant to "whether [the defendant] had the requisite mental state to be convicted of the charged crimes." *Garnes*, 102 F.4th at 641–42. This Court ruled that, in addition to misunderstanding the probative value of the evidence, the district court failed to appreciate that any prejudice "could be mitigated by a limiting instruction"—specifically, one that instructed the jury that it was "not to speculate" on the defendant's criminal history, and was to "consider the statements only for specified purposes." *Id.* at 642.

The same is true here. Like in *Garnes*, the evidence was part of the very story surrounding the crime—and was important in determining

whether the defendant "had the requisite mental state to be convicted of the charged crimes." *Garnes*, 102 F.4th at 641–42. Particularly given that purpose, the district court erred in failing to even consider whether a limiting instruction could alleviate any risk of unfair prejudice to the government. The limiting instruction would tell the jury that it was to consider the evidence "only for specified purposes," *id.* at 642—namely, what Ms. Dali's understanding and knowledge was at the time of the offense, and thus whether she possessed the mens rea needed to find her guilty. The court would then admonish the jury that it was not to consider the evidence to otherwise excuse Ms. Dali from liability, or for any other purpose.

The district court also found that, "to the extent the Government contests" Ms. Dali's "actual belief" that she was poisoned, "it could take us off on a side road that would amount to a trial within a trial." 1A.74.[2] But

---

[2] Obviously the defense was not asking the jury to find that Ms. Dali was actually poisoned. Her statements about poisoning were offered to show her state of mind, not for their truth. In this way, the only dispute would be whether Ms. Dali actually believed that she was being poisoned.

whether Ms. Dali believed she was poisoned turned on her credibility and state of mind—matters that were already at issue, and in fact were amply explored at trial. Indeed, the evidence regarding Ms. Dali's poisoning beliefs—evidence that the District Court suggested would take the case "off on a side road"—substantially overlapped with evidence admitted at trial.

In its motion in limine, for example, the government pointed to Ms. Dali's "calm and collected demeanor during her post-arrest interview" as undercutting her poisoning belief. 1A.66. And at trial, the government introduced numerous clips of Ms. Dali during her interview, and even questioned her about her demeanor during it. 2A.463. And as purportedly undercutting Ms. Dali's poisoning belief, the government pointed to the apparent fact that Ms. Dali had returned to the United States in February 2024—but the government introduced that evidence at trial anyways to speak to Ms. Dali's state of mind. *See* 2A.510 (noting that in February 2024, Ms. Dali "was found in the international arrivals terminal. You can draw your own conclusions about that."). Given the strong overlap between evidence introduced at trial and the evidence that *would have* been

introduced at trial, the District Court's fears of a "trial within a trial" were overblown—and certainly not enough to warrant the "extraordinary remedy" of exclusion under Rule 403. *Celotex Corp*., 914 F.2d at 31.

### D. The error was not harmless.

The district court's error was not harmless. As an initial matter, the error was of a constitutional dimension: By excluding evidence of Ms. Dali's mens rea, the district court excluded evidence that was crucial to Ms. Dali's very right to present a defense. What is more, by denying Ms. Dali the right to respond to the government's arguments on motive, the district court violated Ms. Dali's due process rights. *See, e.g.*, *Whitman*, 771 F.2d at 1351 (holding that while "[t]he district court was free to exclude evidence of [the defendant's] motive," "once the government produced evidence from which the jury could reasonably infer the ... motive, appellant had the right to rebut this evidence" as a matter of due process). And "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

This Court cannot do so here. As this Court has repeatedly explained, regardless of whether the evidentiary error rises to the level of a constitutional violation, it "cannot find it harmless to exclude a statement that 'would have supported the main theory of the defense.'" *Detrich*, 865 F.2d at 21 (quoting *United States v. Harris*, 733 F.2d 994, 1005 (2d Cir. 1984)).

Defense counsel's entire defense at trial was that the government had failed to prove that Ms. Dali knew she lacked consent to get aboard the Delta flight. And that argument turned entirely on Ms. Dali's state of mind—and on proving that while a reasonable person may have understood that a gate agent failing to check a boarding pass did not equal permission to get on that flight, Ms. Dali did not understand human behavior the way others do.

But defense counsel was prevented from eliciting critical evidence that Ms. Dali doesn't see things the way others do: that she was suffering from delusions that made her misunderstand human behavior, to the point she believed she was poisoned. Indeed, the district court's aversion to any mental-health evidence was so strong that when defense counsel said

during summation that, based on what the jury knew about the Connecticut incident, Ms. Dali was not "thinking straight," the Court called a sidebar and said that defense counsel "sound[ed] like he was making a mental disease argument." 2A.498. And it affirmatively precluded the jury from considering whether Ms. Dali had any mental condition that could contextualize her behavior or illustrate her state of mind. 2A.508, 2A.530.

Beyond being unable to rebut the government's arguments on mens rea, defense counsel could not rebut the government's misleading arguments on motive. The government repeatedly suggested—entirely contrary to the evidence—that Ms. Dali was motivated simply to get a free flight. And the government used that argument on motive to bolster its claim that Ms. Dali acted knowingly and deliberately—that she "knew exactly what she was doing." Defense counsel—and Ms. Dali herself, when she testified—was prohibited from mentioning the one fact that would undermine that argument: that Ms. Dali was not looking to take a European vacation, but in fact was fleeing because she believed she was being poisoned.

The government will no doubt point to other purported indicia that Ms. Dali acted knowingly—such as the prior times Ms. Dali apparently tried to board flights without a boarding pass; her behavior at the airport and on the plane; and her statements to law enforcement. But much of this evidence is circumstantial, and "[w]hen the government's proof relies primarily on circumstantial evidence, trial errors tend to acquire greater significance ... It takes less to tip the scales." *Detrich*, 865 F.2d at 22 (noting that government's "circumstantial" proof of knowledge was "far from overwhelming").

Beyond being just circumstantial, much of the evidence was equivocal. Was Ms. Dali hiding in the plane's bathroom, or was she in fact ill, as she and the flight attendant suggested? *See* 1A.284, 1A.290 (flight attendant reporting that Ms. Dali "looked like she ... didn't feel well," and that she looked "pale"). If Ms. Dali was watchful in the airport, is it because she knew she was doing something wrong, or because she was concerned about her imagined persecutors? Did Ms. Dali carefully evade airport security, or did her actions—like marching up to Connecticut TSA agents

and having her face scanned, despite lacking identification or a boarding pass—bespeak someone who thought she could secure permission to fly even without meeting traditional requirements? Evidence of Ms. Dali's delusions and her basic inability to understand human behavior could have cast all this equivocal evidence in a different light.

As for Ms. Dali's statements, they too do not render the exclusion of mental health evidence harmless beyond a reasonable doubt. After being asked repeatedly about her travel documents, Ms. Dali did suggest that she was "afraid" that someone would ask her for a boarding pass, and said that she was "scared" because I "believe, I believe [inaudible] administrative [inaudible] I … I'm breaking the administrative law because I was studying law." 3A.626. But Ms. Dali was never clear on which law she believed she was breaking, or what she even understood an "administrative law" to be. 3A.626; *see also* 2A.501. And the detective admitted that those comments came toward the end of a two-hour interview, after Ms. Dali had been in the custody of the French authorities for approximately a week and had

just been on a transatlantic flight back to the United States. 2A.422–24; 2A.430.

At bottom, the government was permitted to present a one-sided account of the offense—one that not only excluded, but in fact misstated, fundamental information about Ms. Dali's mental state at the time. The evidence of Ms. Dali's delusions would have reframed virtually everything the jury saw and heard, including Ms. Dali's own testimony. This error was therefore not harmless.

## CONCLUSION

This Court should vacate Ms. Dali's conviction and remand for further proceedings.

Dated: New York, New York
December 3, 2025

Respectfully submitted,
Federal Defenders of New York, Inc.
By: /s/ Siobhan C. Atkins
Siobhan C. Atkins, Esq.
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8793

**CERTIFICATE OF SERVICE**

I certify that a copy of this Brief has been served by ACMS on the United States Attorney/E.D.N.Y.; Attention: Brooke Theodora, Assistant United States Attorney.

Dated: New York, New York
December 3, 2025

/s/ Siobhan C. Atkins
Siobhan C. Atkins

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32 because:

> this brief contains 9,260 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a monospaced typeface using **Microsoft Word** with **14 characters per inch in Palatino Linotype** type style.

Dated: New York, New York
December 3, 2025

/s/ Siobhan C. Atkins
Siobhan C. Atkins